UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MONIQUE NADALE KNOWLES,

    Plaintiff,

v.                                                                                   Case No:  6:12-cv-101-Orl-22TBS

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____

## REPORT AND RECOMMENDATION[1]

Plaintiff brings this action pursuant to the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Act.

I have reviewed the record, including a transcript of the proceedings before the administrative law judge ("ALJ"), the exhibits, administrative record, and the pleadings and memoranda submitted by the parties.  For the reasons that follow, I respectfully recommend that the Commissioner's final decision in this case be **reversed and remanded** pursuant to sentence four of 42 U.S.C. § 405(g).

### I.    Procedural History

On October 19, 2009, Plaintiff filed for DIB and SSI, alleging that her disability began on January 1, 2008.  (Tr. 21).  Her application was denied initially and upon

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and M.D. FLA. R. 6.02, within fourteen (14) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

reconsideration. (Id.) Plaintiff requested and received a hearing before the ALJ on June 9, 2011. (Id.) Plaintiff has a high school diploma and has completed training as a nursing assistant/home health aide. (Tr. 179). She was 39 years old when she attended the administrative hearing. (Tr. 69). Her past relevant work was as a nursing assistant. (Tr. 173). The only two witnesses at the hearing were Plaintiff and a vocational expert ("VE"). (Tr. 674-693).

After considering the testimony and other evidence presented, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the date she filed her DIB and SSI applications. (Tr. 17). The ALJ found Plaintiff was severely impaired by diabetes mellitus, adjustment disorder, anxiety disorder and hypoglycemia. (Id.) But, the ALJ said Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 18). The ALJ also found that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence or pace. (Tr.18-19). The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform medium work except, due to moderate limitations in concentration, persistence, or pace, and social functioning, she was limited to performing simple 1-2 tasks, understanding simple 1-2 step instructions, and she could have only occasional interaction with the public. (Tr. 20). In making this determination, the ALJ found that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms was not credible. (Tr. 21). Based on the Medical-Vocational Guidelines, 20 C.F.R. Part 4, Supart P, Appendix 2, and the testimony of the VE, the ALJ decided that Plaintiff could perform work available in significant numbers in the national economy, and

thus, Plaintiff was not under a disability from her alleged onset date through the July 18, 2011 date of the ALJ's decision. (Tr. 30-31). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on December 1, 2011. (Tr. 7-11). Accordingly, the ALJ's decision is the final decision of the Commissioner. Plaintiff filed this action for judicial review on January 23, 2012 (Doc. 1).

## II.     Jurisdiction.

Plaintiff has exhausted all available administrative remedies and timely filed this action. Accordingly, the case is properly before this Court which has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    Standard of Review.

To be entitled to DIB and SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" under the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether an individual is disabled, the ALJ applies the five step sequential evaluation process established by the Social Security Administration and set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). Using the evaluation process, the ALJ must determine whether the claimant (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically

equals an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. See Phillips v. Barnhart, 357 F.3d 1232, 1237-1240 (11th Cir. 2004). The claimant bears the burden of persuasion through step four and at step five the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Phillips, 357 F.3d at 1241 n.10.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla but less than a preponderance. It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).

When the Commissioner's decision is supported by substantial evidence the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). The district court "may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" Id. "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote, 67 F.3d 1533, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

- 4 -

There is a presumption in favor of the ALJ's findings of fact but no such presumption attaches to the ALJ's conclusions of law.  Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam).  The Court will reverse a final decision if the ALJ incorrectly applied the law, or failed to provide sufficient reasoning for the Court to determine whether the ALJ properly applied the law.  Keeton v. Dep't of Health & Human Serv's, 21 F.3d 1064, 1066 (11th Cir. 1992).   When it reviews a final decision, the Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with our without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

### IV.    Statement of Facts.

I have reviewed the record, including a transcript of the proceedings before the ALJ, the exhibits, the administrative record, and the pleadings and memoranda submitted by the parties.  I find the facts are adequately set forth in the parties' memoranda and the ALJ's decision.  Therefore, I will only summarize the pertinent portions of the record to protect Plaintiff's privacy to the extent possible.

Plaintiff alleges that she has been unable to work since January 1, 2008, due to depression, diabetes, anxiety, high blood pressure, acid reflux, neuropathy, shortness of breath, asthma, insomnia, fatigue, lung disease, and heart disease. (Tr. 69, 172).

On November 23, 2005, Plaintiff saw Maria Harrington, ARNP for a follow-up appointment. (Tr. 243-244). She reported that her neuropathic pains continued in her right hand and arm and lower bilateral extremities. (Tr. 243). On January 27, 2006, she complained of right shoulder tightness and pain that radiated down to her right elbow. (Tr. 241). On March 29, 2006, she said she continued taking Lyrica for her neuropathy, but had experienced little improvement. (Tr. 236). On April 26, 2006 and June 9, 2006, Plaintiff stated that an increased dosage of Lyrica had helped slightly with her

neuropathy.  (Tr. 231, 234).  On June 20, 2007, Ms. Harrington reported that Plaintiff seemed to be experiencing headaches on a daily basis.  (Tr. 211).

On April 2, 2007, Plaintiff was admitted to Health Central Hospital with a diagnosis of mastoiditis.[2]  (Tr. 188).  The impression was recurrent mastoiditis, uncontrolled type 1 diabetes mellitus, and mild hyponatremia[3] secondary to uncontrolled diabetes mellitus. (Tr. 189). She was discharged on April 5, 2007 with a final diagnoses of mastoiditis, uncontrolled type 1 diabetes mellitus, hyponatremia, diabetic neuropathy and hypertension.  (Tr. 181).

On January 3, 2009, Plaintiff began treating at The Center for Foot and Ankle Medicine for at risk foot care. (Tr. 471). She was symptomatic for tingling and numbness in her feet and toes. (Id.).  Touch, pin, vibratory and proprioception sensations were decreased and abnormal per monofilament wire test. (Id.)  Pathologic reflexes were absent. (Id.)  Plaintiff was assessed with controlled diabetes mellitus, type II with neurological manifestations; onychocryptosis[4]; onychodystrophy[5]; and bilateral onychogryposis.[6] (Id.)

On March 18, 2009, Plaintiff was admitted to Dr. Phillips Hospital for uncontrolled

---

[2] Mastoiditis is an infection of the mastoid bone of the skull. *Available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002029/.

[3] Hyponatremia is a metabolic condition in which there is not enough sodium (salt) in the body fluids outside the cells. *Available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001431/.

[4] Onychocryptosis is an ingrown toenail that occurs when the edge of the nail grows down and into the skin of the toe. There may be pain, redness, and swelling around the nail. *Available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002217/.

[5] Onychodystrophy is a dystrophic change in fingernails or toenails, such as malformation or discoloration, occurring as a congenital defect or due to illness or injury. *Available at* http://medical-dictionary.thefreedictionary.com/onychodystrophy.

[6] Onychogryposis is hypertrophy and curving of the nails, giving them a clawlike appearance. *Available at* http://medical-ictionary.thefreedictionary.com/onychogryphosis.

diabetes mellitus ketoacidosis.[7]  (Tr. 252).  She was discharged on March 21, 2009, with a principal diagnosis of diabetes mellitus ketoacidosis and secondary diagnoses of dehydration, hypertension, hypopotassemia, headaches, gastroesophageal reflux disease and peripheral neuropathy.  (Id.)

On June 11, 2009, Plaintiff was admitted to Dr. Phillips Hospital again, this time with complaints of shortness of breath. (Tr. 266).  She was discharged on June 15, 2009 with a principal diagnosis of uncontrolled diabetes mellitus and secondary diagnoses of hypertension, gastroesophageal reflux disease, peripheral neuropathy, asthma, other lung disease, and heart disease not otherwise specified. (Id.)

On August 23, 2009, Plaintiff was admitted to Dr. Phillips Hospital for uncontrolled diabetes mellitus ketoacidosis.  (Tr. 300).  She was discharged on August 25, 2009 with a principal diagnosis of uncontrolled diabetes mellitus ketoacidosis and secondary diagnoses of candidal esophagitis, gastroesophageal reflux disease, hypertension and peripheral neuropathy.  (Id.)

On September 5, 2009, Plaintiff presented to Lakeside Behavioral Healthcare ("Lakeside") with feelings of depression, worthlessness and hopelessness.  (Tr. 444). She said she was experiencing low energy, isolation, crying spells, trouble sleeping and poor appetite. (Id.)  The preliminary diagnostic impression was depressive disorder not otherwise specified and she was assigned a Global Assessment of Functioning[8] score of

---

[7] Diabetic ketoacidosis occurs when the body cannot use sugar (glucose) as a fuel source because there is no insulin or not enough insulin. Fat is used for fuel instead. *Available at* http://www.nlm.nih.gov/medlineplus/ency/article/000320.htm.

[8] The Global Assessment of Functioning Scale ("GAF") ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Diagnostic and Statistical Manual of Mental Disorders–Fourth Edition* ("DSM-IV").

45.[9] (Tr. 445).

On September 16, 2009, intake at Lakeside reported that Plaintiff had a poor attention span and poor concentration. (Tr. 439). She appeared depressed, irritable, anxious and had poor insight. (Tr. 440). Intake assigned a diagnosis of recurrent major depression without psychotic features. (Tr. 441). Plaintiff was assigned a current GAF score of 35[10] and the physician opined that her highest GAF score during the past year was 45. (Id.).

On September 23, 2009, Plaintiff saw Madhu Banda, M.D. at the Florida Diabetes and Endocrine Center for an initial consultation. (Tr. 389-390). Dr. Banda's impression was uncontrolled type 1 diabetes with a hemoglobin A1c of 12.3 in August 2009. (Tr. 389).

On January 14, 2010, Plaintiff went to a follow-up appointment at Lakeside. (Tr. 425-426). Her diagnoses included mood disorder as evidenced by appetite disturbance, sleep disturbance, frequent tearfulness and anxiety disorder as evidenced by anxiousness, fearfulness, and panic attacks. (Id.) Plaintiff reported feeling worse since her last visit, experiencing increased anxiety when she left her house and some dizziness. (Tr. 420).

On January 27, 2010, Plaintiff saw David J. Fleischmann, Ph.D. at the request of the Office of Disability Determinations for a consultative psychological evaluation. (Tr.

---

[9] The range of 41 to 50 is defined as "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (DSM-IV).

[10] A GAF of 31-40 is defined as "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). (DSM-IV).

- 8 -

345-347).  Dr. Fleischmann's diagnoses included adjustment disorder with physical complaints and depressed mood, anxiety disorder with panic attacks and agoraphobic avoidance.  (Tr. 347).  The doctor noted that "[r]ecent hospitalizations for complications of diabetes have contributed to [Plaintiff's] anxious mood. Neuropathy associated with diabetes, and foot pain and numbness that limits her activities also contribute to her chronic adjustment difficulties and mood d[i]sharmony. Other existing respiratory, cardiovascular, and digestive conditions and symptoms may also contribute."  (Id.)

Doctor Patricia A. Clark, Psy.D., a non-examining state agency consultant reviewed the record on February 12, 2010, and opined that Plaintiff suffered from adjustment disorder with physical complaints and depression, depressive disorder not otherwise specified, and anxiety disorder with panic attacks and agoraphobic avoidance. (Tr. 367).  Dr. Clark completed a Psychiatric Review Technique form ("PRT") in which she checked boxes in section one indicating that Plaintiff was moderately limited in her ability to maintain social functioning; the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting.  (Tr. 377, 381-382).  Dr. Clark also felt Plaintiff was mildly limited in her activities of daily living and the ability to maintain concentration, persistence or pace.  (Tr. 377).

On February 18, 2010, Plaintiff returned to Dr. Banda for a follow-up appointment.

(Tr. 385). The doctor's impression was uncontrolled type 1 diabetes with a hemoglobin A1c of 10.6 in December 2009. (Tr. 385).

On April 15, 2010, Plaintiff was admitted to Orlando Regional Medical Center for hypoglycemia.[11] (Tr. 538).

On April 29, 2010, a non-examining state agency consultant reviewed the record and opined that Plaintiff was capable of performing medium work. (Tr. 493). The consultant noted that Plaintiff had no postural limitations, manipulative limitations or environmental limitations. (Tr. 494-496).

Non-examining state agency consultant Dr. Violet Acero Stone, M.D. considered the record on April 30, 2010, and wrote that Plaintiff suffered from major depressive disorder, adjustment disorder, and anxiety disorder. (Tr. 503, 505-506). Dr. Stone completed a PRT, checking the boxes in section one indicating that Plaintiff was moderately limited in her ability to maintain concentration, persistence or pace; the ability to maintain attention and concentration for extended periods; and the ability to set realistic goals or make plans independently of others. (Tr. 510, 514-515). Dr. Stone believed Plaintiff was mildly limited in her activities of daily living and the ability to maintain social functioning. (Tr. 510).

On May 17, 2010, Plaintiff began seeing orthopedic surgeon, Norton M. Baker, M.D. at Baker, Heard, Osteen and Davenport, M.D., P.A. (Tr. 572). She was experiencing back pain and Dr. Baker noted she was suffering from "marked tightness in her back with loss of motion in all directions," and she had loss of motion in her neck. (Id.) Plaintiff's straight leg raising was positive at 60 degrees, neurologically and

---

[11] Hypoglycemia is a condition that occurs when your blood sugar (glucose) is too low. *Available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001423/.

vascularly her lower extremities were good, and her hip exam was good. (Id.) Plaintiff's x-rays revealed facet joint arthritis. (Id.)

On June 3, 2010, Plaintiff saw W. Clark Davenport, M.D. for evaluation of both of her wrists. (Tr. 568-570). She complained of numbness in median nerve distribution, tingling in her fingers and pain in her wrists. (Tr. 568). Dr. Davenport recommended she wear wrist supports at night. (Tr. 570). On June 23, 2010, Plaintiff had an electromyogram ("EMG") performed on both of her arms. (Tr. 567). The findings were consistent with mild polyneuropathy as suggested by her history of diabetes mellitus. (Id.)

At a July 21, 2010, follow-up appointment, Dr. Davenport found Plaintiff suffered from nerve conduction velocity ("NCV") consistent with peripheral neuropathy in both of her wrists and forearms. (Tr. 566).

On August 3, 2010, Plaintiff returned to Dr. Davenport with complaints of pain in both of her knees that worsened when kneeling and squatting. (Tr. 562). Dr. Davenport's impression was patella femoral pain syndrome in both knees. (Tr. 564).

During a September 14, 2010 follow-up appointment with Dr. Davenport, Plaintiff stated that physical therapy had been beneficial. (Tr. 559). Dr. Davenport recommended Plaintiff wear a Palumbo type brace on both of her knees and continue physical therapy. (Tr. 560). On November 23, 2010, Plaintiff returned to Dr. Davenport for a follow-up appointment and reported the knee braces were helping. (Tr. 553). Dr. Davenport noted her "knees are stable and appear to be improving." (Id.).

On November 11, 2010, Plaintiff went back to Lakeside for a follow-up appointment (Tr. 631-632). She complained of sleep disturbance, increased depression, increased anxiety and panic attacks every day. (Tr. 631).

On February 1, 2011, Plaintiff was admitted to Orlando Regional Medical Center due to severe headaches. (Tr. 545). She was discharged with a diagnosis of unspecified migraines. (Id.).

On February 10, 2011, Plaintiff saw Vanessa Nieves, D.P.M. with complaints that the skin over her legs, ankles and feet was tingling, burning and numb. (Tr. 644). She was taking Neurotin, as prescribed by her primary care physician, but her condition was worsening to the point that she was unable to wear shoes without experiencing pain. (Id.) Dr. Nieves's impression was "[c]ontrolled diabetes mellitus, type II w[ith] neurological manifestations, severe" and severe hyperesthesia. (Tr. 643). Geovanny Chico, D.P.M. repeated this diagnosis on February 17, 2011. (Tr. 641-642).

On February 22, 2011, Plaintiff went for a follow-up appointment at the Florida Diabetes and Endocrine Center where a nurse practitioner noted that she suffered from neuropathy and uncontrolled diabetes mellitus. (Tr. 614). At the time, Plaintiff was experiencing numbness, tingling and bloating. (Id.)

### V.     Hearing before the ALJ

At the hearing before the ALJ, Plaintiff testified that she has neuropathy in all of her extremities. (Tr. 683). She said she experiences numbness, tingling and a burning sensation in her feet. (Id.) She related numbness, cramping and sharp pains in her hands. (Id.) She testified that she has trouble picking up small objects due to the numbness and tingling in her fingers. (Tr. 688). And, she stated that she was unable to make a strong grip and could only lift three or four pounds. (Id.)

The VE testified that a hypothetical person with the Plaintiff's RFC could not perform Plaintiff's past work, but the VE said such a person could perform the jobs of cleaner and housekeeper. (Tr. 692). If the hypothetical question was modified to assume

a person who (1) was unable to engage in sustained work on a regular, consistent basis; or (2) who had restrictions in reaching, handling and fingering, the VE testified that person would be unable to work. (Tr. 692-693).

In his opinion, the ALJ considered Plaintiff's RFC, age, education and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and concluded there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 30, finding no. 9; Tr. 691-693). Consequently, the ALJ determined that Plaintiff was not disabled from January 15, 2007, through August 26, 2009, the date of the ALJ's decision. (Tr. 25-26, finding no. 10).

### VI. Discussion

On appeal, Plaintiff argues that (1) the ALJ's finding that Plaintiff's peripheral neuropathy is not severe is not supported by substantial evidence; and (2) the ALJ erred by affording great weight to the state agency psychologist's opinion without incorporating all of the state agency psychologist's findings into Plaintiff's RFC.

### A. Plaintiff's Peripheral Neuropathy

Plaintiff argues that the ALJ committed reversible error when he determined that her peripheral neuropathy was not a severe impairment and consequently, the ALJ improperly evaluated Plaintiff's subjective complaints of pain.

"[A] 'severe impairment' [is] defined as 'any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities.'" Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (quoting 20 C.F.R. § 404.1520(c)). In McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986), the Eleventh Circuit held that the claimant's burden of showing severity is low, stating:

> An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal.

To qualify as a severe impairment at Step Two of the sequential evaluation process, an impairment must significantly limit a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a); Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987). The impairment(s) also must be severe for at least twelve consecutive months. See 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(a)(4)(ii), 416.905(a), 416.909, 416.920(a)(4)(ii); Barnhart v. Walton, 535 U.S. 212, 217, 122 S. Ct. 1265, 1269 (2002).

The ALJ determined that Plaintiff's diabetes mellitus was a severe impairment and that her condition had resulted in neuropathy. (Tr. 17, finding No. 3; Tr. 18, 28). Now, Plaintiff complains that the ALJ failed to recognize that her peripheral neuropathy is also a severe impairment. Plaintiff's argument is based upon the following statement in the ALJ's decision:

> The musculoskeletal disorder is also found non-severe as her symptoms are related to neuropathy from diabetes mellitus. (Exhibit 29F). Her symptoms improved with physical therapy and did not last for 12 consecutive months. In addition, x-ray of the shoulder was normal and EMG/NCV study was consistent with peripheral neuropathy (Exhibits 9F and 29F).

(Tr. 18).

The Commissioner argues, and I agree, that Plaintiff misreads the ALJ's opinion. Three things are clear from the quoted language. First, the ALJ understood Plaintiff was claiming disability in part as the result of a musculoskeletal disorder separate from her diabetes mellitus with peripheral neuropathy. Second, the ALJ did not use the terms

- 14 -

musculoskeletal disorder and peripheral neuropathy interchangeably. Third, the ALJ recognized that Plaintiff's peripheral neuropathy was caused by her diabetes mellitus.

The ALJ referenced Exhibits 9F and 29F. These are medical records of Plaintiff's treatment for back pain (Tr. 571-572); shoulder pain (Tr. 325); knee pain (Tr. 553-564); and wrist pain (Tr. 565-569). They tend to show that routine physical therapy managed Plaintiff's pain. The ALJ relied on these exhibits to find that Plaintiff's claim of a musculoskeletal disorder, i.e. her complaints of pain in her back, knees, wrists, and shoulder, was actually the result of Plaintiff's neuropathy.

The ALJ's listing of Plaintiff's diabetes mellitus as a severe impairment implicitly includes a diagnosis of peripheral neuropathy, and that the condition is severe. While the ALJ did not explicitly identify Plaintiff's peripheral neuropathy as a severe impairment, "[n]othing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe. Instead, at step three, the ALJ is required to demonstrate that it has considered all of the claimant's impairments, whether severe or not, in combination." Heatly v. Commissioner of Social Security, 382 F. App'x 823, 825 (11th Cir. 2010).[12] As long as the ALJ lists any severe impairment at Step Two, the requirements of that step are satisfied. Id.; see also Burgin v. Comm'r of Soc. Sec., 420 F. App'x 901, 902 (11th Cir. 2011) (citing Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)). Here, the ALJ listed other severe impairments at Step Two.

The ALJ considered Plaintiff's peripheral neuropathy when assessing Plaintiff's RFC, thereby curing any error that may have occurred. Id. For example, the ALJ acknowledged Plaintiff's testimony that her "feet feel like needles and have a hot and cold

---

[12] This is an unpublished opinion. "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." CTA11 Rule 36-2.

sensation," her hands cramp, and she has these feelings all the time. (Tr. 21). The ALJ noted that on January 3, 2009, Plaintiff saw Geovanny Chico, DPM complaining of tingling and numbness of the feet and toes and he assessed Plaintiff with controlled diabetes mellitus, type II with neurological manifestations. (Tr. 21, 26). The ALJ wrote that Plaintiff's diagnosis as of March 21, 2009 included peripheral neuropathy. (Tr. 21). Plaintiff told Dr. Fleischmann she could drive and had a driver's license but did not drive because she lacked sensation in her feet. (Tr. 24). The ALJ noted that medical records covering the period from April 9, 2010 to April 6, 2011, show Plaintiff was treated for diabetes neuropathy, (Tr. 25), and medical records from May 31, 2010 through February 17, 2011 reveal an impression of controlled diabetes mellitus with neurological manifestations. (Tr. 26). An EMG/NCV study showed Plaintiff's symptoms were consistent with a mild neuropathy. (Tr. 18). The ALJ considered all of this evidence in his opinion, and as such, properly considered Plaintiff's neuropathy in his RFC analysis.

### B. Plaintiff's Credibility

After considering the evidence, the ALJ found Plaintiff's claims of disabling symptoms were not credible. The Eleventh Circuit has adopted a two-pronged standard for examining subjective complaints. First, the claimant must provide evidence of an underlying condition. Second, the claimant must submit objective medical evidence confirming the severity of the alleged limitations or alternatively, evidence that the objectively determined medical condition can reasonably be expected to give rise to the claim. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). If the ALJ discredits the claimant's subjective testimony, the ALJ must articulate explicit and adequate reasons for doing so. Id.

- 16 -

One of the reasons the ALJ found Plaintiff's testimony less than credible was that "[t]he medical evidence reveals the [Plaintiff] has a history of diabetes mellitus with peripheral neuropathy for which she is on medications and under control." (Tr. 28). The ALJ did not properly explain this finding, which is contradicted by substantial medical evidence in the record.

Reports from Madhu Banda, M.D. covering the period from March 27, 2007 through February 18, 2010 reveal that he treated Plaintiff for uncontrolled diabetes mellitus. (Tr. 385 -412). On March 18, 2009 Plaintiff was admitted to the hospital due to diabetic ketoacidosis because she had not taken her insulin in three days. When Plaintiff was discharged, the doctor noted that her condition was "better controlled." (Tr. 254). On June 11, 2009 Plaintiff presented to the hospital with uncontrolled blood sugar. (Tr. 268). The final diagnosis was uncontrolled diabetes mellitus. (Id.). On April 29, 2010, Plaintiff told Dr. Garcia she had uncontrolled diabetes in 2009. (Tr. 586). In November of 2010, Plaintiff saw Dr. Banda, whose impression was uncontrolled diabetes mellitus. (Tr. 617). The state agency medical consultant's report, upon which the ALJ specifically relies, lists Plaintiff's diabetes mellitus as uncontrolled as of February 2010, two months before the consultant wrote her opinion. (Tr. 494). And, in early 2011, a nurse practitioner wrote that Plaintiff's diabetes mellitus was uncontrolled. (Tr. 616).

Despite this evidence, the ALJ summarily declared that Plaintiff's condition was controlled. The ALJ did not provide an adequate explanation for his conclusion and he did not state the weight he gave any of the medical opinions or diagnoses except to say he found the state agency consultant's opinion "persuasive as it is consistent with the medical evidence . . . ." (Tr. 29); see McCloud v. Barnhart, 166 F. App'x 410, 418 (11th Cir. 2006) (holding that an ALJ must explain with particularity the weight he gives to

different medical opinions) (citing Sharfaz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987)). Consequently, the ALJ did not apply the proper legal standards when considering Plaintiff's credibility and I respectfully recommend that the case be remanded for further proceedings.

### C. Dr. Clark's Opinions

The ALJ afforded significant weight to Dr. Clark's opinions that Plaintiff could understand, remember and carry out simple instructions, make appropriate decisions, sustain simple tasks, and perform at an acceptable pace. (Tr. 29). The ALJ found that these opinions were "consistent with the consultative psychological evaluation and progress notes from Lakeside Behavioral Healthcare and there are no opinions to the contrary." (Tr. 29). Plaintiff argues that the ALJ failed to consider and discuss Dr. Clark's opinions in section one of the PRT. In Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011), the court remanded to the Commissioner on the basis that the ALJ failed to mention a treating doctor's medical opinion or discuss pertinent elements of an examining doctor's medical opinion, and that the ALJ's conclusions suggested those opinions were not considered.

Plaintiff relies on language in Winschel, stating that "[t]hough the PRT and RFC evaluations are undeniably distinct, *see* 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3), nothing precludes the ALJ from considering the results of the former in his determination of the latter." Id. at 1180. Plaintiff also cites Social Security Ruling 96-8p which provides: "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."

- 18 -

The Commissioner's Program Operations Manual System (POMS), explain that the factors listed in section one of the PRT, entitled "summary conclusions" are intended to be used as "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of the documentation and does not constitute the RFC assessment." POMS § DI 24510.060(B)(2)(a). Other courts have held that because section I of the PRT does not constitute the RFC, the ALJ is free to assign little to no weight to those findings. Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 636-37 (3d Cir. 2010); Shortridge v. Astrue, Case No. 1:11-cv-71-MP-GRJ, 2012 WL 1598012 *8 (N.D. Fla. Apr. 3, 2012); Derrico v. Comm'r of Soc. Sec., Case No. 1:09-cv-03138-AJB, 2011 WL 1157690 *18 (N.D. Ga. Mar. 29, 2011).

The ALJ did not err in failing to include in his decision, or discuss, the twenty factors in section one of the PRT completed by Dr. Clark because they were intended as a "worksheet to aid" Dr. Clark and the ALJ recited almost verbatim Dr. Clark's ultimate functional capacity assessment in his opinion. Accordingly, the ALJ did not commit error.

### V. Recommendation

For the foregoing reasons, I **respectfully recommend** that pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's final decision in this case be **reversed** and **remanded** for further proceedings.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on the 6th day of February 2013.

*[signature]*

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

    Presiding United States District Judge
    Counsel of Record